**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

### No. 17-4109

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

    v.

RAYMOND IDEMUDIA AIGBEKAEN,

        Defendant – Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore. James K. Bredar, Chief District Judge.  (1:15-cr-00462-JKB-2)

Argued:  May 8, 2019                    Decided:  November 21, 2019

Before MOTZ, WYNN, and RICHARDSON, Circuit Judges.

Affirmed by published opinion.  Judge Motz wrote the majority opinion, in which Judge Wynn joined.  Judge Richardson wrote an opinion concurring in the judgment.

**ARGUED:**  Michael Lawlor, BRENNAN, MCKENNA & LAWLOR, CHTD., Greenbelt, Maryland, for Appellant.  Matthew James Maddox, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.  **ON BRIEF:**  Robert K. Hur, United States Attorney, Ayn B. Ducao, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

DIANA GRIBBON MOTZ, Circuit Judge:

In April of 2015, a minor alerted law enforcement officers that Raymond Idemudia Aigbekaen and another man had trafficked her for sex in three mid-Atlantic states. As part of the investigation that followed, when Aigbekaen returned to the United States from traveling abroad, the Government seized his MacBook Pro laptop, iPhone, and iPod at the airport and conducted warrantless forensic searches of the data on all three devices. The Government subsequently charged Aigbekaen with sex trafficking and related crimes, and at the conclusion of a nine-day trial, the jury convicted him of these crimes.

Aigbekaen appeals, arguing primarily that the warrantless forensic searches of his digital devices violated the Fourth Amendment. The Government counters that the searches fell within the "border search" exception to the warrant requirement and that, in any event, suppression is not appropriate. We agree with Aigbekaen that the border search exception does not extend to the challenged searches, rendering them unconstitutional. But we agree with the Government that the good-faith exception to the exclusionary rule bars suppression. Accordingly, we affirm.

I.

On April 12, 2015, a sixteen-year-old girl (to whom we, like the parties, refer pseudonymously as "L.") called 911 from a Homewood Suites hotel in Bel Air, Maryland. L. reported that she had run away from home and was looking for help. When an officer arrived on the scene and spoke with L., she claimed not to remember with whom she had traveled or where she had been. But after some equivocation, L. disclosed that two men,

2

one named Marcell Greene and another of Nigerian ethnicity named "Raymond," had transported her around Maryland, Virginia, and Long Island, New York; had posted ads of her on Backpage.com; and had trafficked her for sex. L. provided phone numbers for these men and identified Greene and Raymond Aigbekaen in hotel surveillance footage. She also recognized images of herself from online prostitution ads on Backpage.com. Homewood Suites records showed that Aigbekaen had rented L.'s hotel room. Officers searched the room and found used condoms.[1]

Local law enforcement officers then sent their complete case file to Homeland Security Investigations (HSI), an investigative arm of the U.S. Department of Homeland Security. After receiving the case file, HSI subpoenaed Verizon Wireless and Backpage.com; the companies' responses confirmed that the phone number L. had provided indeed belonged to Aigbekaen, and that this number was listed as a contact on the Backpage.com prostitution ads. The Backpage.com ads were also linked to two Yahoo! email addresses, each of which contained portions of Aigbekaen's name. HSI further uncovered rental car and hotel records that showed Aigbekaen had traveled to hotels in Maryland, Virginia, and Long Island.

---

[1] By the time of Aigbekaen's trial, L. was able to testify more fully that she and two other girls had fled a group home in Dix Hills, New York in January 2015 to live with a man named Y.P., who trafficked them for sex. L. was able to escape Y.P. with Greene's sister, Jasmine. But Jasmine relocated L. to Greene's home, where Greene and Jasmine decided to continue trafficking her. Greene then contacted Aigbekaen, who joined the scheme. Greene and Aigbekaen proceeded to transport L. around Maryland, Virginia, and Long Island, where she had sex for pay with as many as five men each day. Greene and Aigbekaen kept all of the proceeds.

HSI agents learned that Aigbekaen had left the country and was set to return through John F. Kennedy International Airport. The agents asked U.S. Customs and Border Protection officers to seize any electronic media devices in Aigbekaen's possession at the airport upon his return. On May 19, 2015, the officers honored this request and, without warrants, seized Aigbekaen's MacBook Pro laptop computer, iPhone, and iPod. The officers transported the devices to Baltimore, where an HSI agent created and reviewed a forensic image of each device. HSI did not return the devices to Aigbekaen until June 2, 2015. The forensic search[2] of the laptop revealed temporary backups of Facebook Messenger conversations between Aigbekaen and another user that apparently related to sex trafficking.

A few months after the warrantless forensic searches, the Government secured and executed search warrants for the same MacBook Pro and iPhone, Aigbekaen's Facebook and Yahoo! accounts, his vehicle, five additional cell phones, his DNA, and Greene's residence. A magistrate judge also granted the Government's application to procure cell site location information ("CSLI") under the Stored Communications Act ("SCA") without obtaining a warrant.

---

[2] A "forensic search" is "a powerful tool" capable of not only viewing data that a user has intentionally saved on a digital device, but also "unlocking password-protected files, restoring deleted material, and retrieving images viewed on websites." *United States v. Cotterman*, 709 F.3d 952, 957 (9th Cir. 2013). Unlike a "manual" search of a digital device, a forensic search generally entails the connection of external equipment and/or the use of specialized software. *United States v. Kolsuz*, 890 F.3d 133, 146 & n.6 (4th Cir. 2018).

In the midst of these warrant and SCA applications, a grand jury indicted Greene and Aigbekaen on six counts, all of which related to interstate sex trafficking of L. and transportation of her for the purpose of prostitution. Prior to trial, Aigbekaen moved to suppress various pieces of evidence, including (as relevant here) any evidence recovered from the May 2015 warrantless forensic searches.

Aigbekaen argued that the May 2015 forensic searches were unconstitutional because they were conducted without warrants and did not fall within the border search exception to the warrant requirement. Aigbekaen maintained that "there has to be a point at which the nature of the government investigation is so separated and so divorced from anything related to the border" that the exception becomes inapplicable. He explained that the Government's "general interest in enforcing [domestic] criminal laws" does not constitute an interest justifying "border searches." The Government responded that, at the time of the forensic searches, it had reasonable suspicion both that Aigbekaen had trafficked L. for sex domestically and that he "might be bringing contraband in the form of child pornography into the country," citing for the latter argument only an "allegation from the manager of the hotel where the victim was recovered."

At the close of the suppression hearing, the district court dismissed the Government's child pornography argument as "a lot weaker" but held that under "the traditional border search analysis," "the circumstances of where the property was and where the person was when the search occurred" "trump[ed]" any need to justify the specific search. As a result, the court found that no warrants were required for the May 2015 searches. The court further reasoned that if any individualized suspicion was needed

5

to justify the "intrusive" forensic searches of Aigbekaen's devices, the Government met this standard because HSI had "at least" reasonable suspicion, if not probable cause, that the warrantless searches would reveal evidence of domestic sex trafficking.[3]

The court thus denied the suppression motion, and Aigbekaen proceeded to trial. After considering testimony from over twenty witnesses, a jury found Aigbekaen guilty on all six counts. Aigbekaen timely noted this appeal.


## II.

Aigbekaen's principal argument on appeal is that the May 2015 warrantless forensic searches of his laptop, iPhone, and iPod violated the Fourth Amendment. Although the Government contends (and we ultimately agree) that the good-faith exception to the exclusionary rule requires affirmance in any event, "when a Fourth Amendment case presents a novel question of law whose resolution is necessary to guide future action by law enforcement officers and magistrates, there is sufficient reason for [a court] to decide the violation issue before turning to the good-faith question." *United States v. Bosyk*, 933

---

[3] Prior to trial, Aigbekaen also moved to suppress the CSLI on the ground that the Government's procurement of it constituted a search and so required a warrant. He later conceded, and the district court held, that then-controlling circuit precedent foreclosed his claim. *See United States v. Graham*, 824 F.3d 421, 424–25 (4th Cir. 2016) (en banc), *abrogated by Carpenter v. United States*, 138 S. Ct. 2206, 2223 (2018). During the pendency of this appeal, the Supreme Court vindicated Aigbekaen's position. *See Carpenter*, 138 S. Ct. at 2223. But as Aigbekaen acknowledges, binding circuit precedent nevertheless precludes suppression of the CSLI because the Government obtained it in good-faith reliance on a federal statutory scheme — namely, the SCA. *United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018).

F.3d 319, 332 n.10 (4th Cir. 2019) (alterations in original) (quoting *Illinois v. Gates*, 462 U.S. 213, 264 (1983) (White, J., concurring)).

We review the district court's legal conclusions de novo and its factual findings for clear error, considering the record evidence in the light most favorable to the Government. *Kolsuz*, 890 F.3d at 141–42. Because the Government conducted the challenged searches without warrants, it bears the burden of proving, by a preponderance of the evidence, that an exception to the warrant requirement applies. *United States v. Davis*, 690 F.3d 226, 262 (4th Cir. 2012).

A.

The Fourth Amendment requires that governmental searches and seizures be reasonable. In most cases, this requires a warrant based on probable cause. *See, e.g.*, *Riley v. California*, 573 U.S. 373, 382 (2014).[4] "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Riley*, 573 U.S. at 382.

One such exception applies at our nation's borders, where the Supreme Court has long recognized the federal Government's substantial sovereign interests in "protect[ing] . . . territorial integrity" and national security, *United States v. Flores-Montano*, 541 U.S.

---

[4] Aigbekaen maintains that *Riley*, which held the search incident to arrest exception inapplicable to modern cell phones, similarly renders the border search exception categorically inapplicable to modern cell phones and analogous digital devices. *See id.* at 403. However, we have held after *Riley* that law enforcement officers may conduct a warrantless forensic search of a cell phone under the border search exception where the officers possess sufficient individualized suspicion of transnational criminal activity. *See Kolsuz*, 890 F.3d at 148. Accordingly, we must reject Aigbekaen's interpretation of *Riley*.

149, 153 (2004); blocking "the entry of unwanted persons and effects," *id.* at 152; "regulat[ing] the collection of duties," *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985); and "prevent[ing] the introduction of contraband," *id.* These Government concerns are "at [their] zenith" at the border, whereas an individual's "expectation of privacy is less at the border than it is in the interior." *Flores-Montano*, 541 U.S. at 152, 154. Thus, "[a]t a border" or its "functional equivalent, like [an] international airport . . . government agents may conduct routine searches and seizures of persons and property without a warrant or any individualized suspicion." *Kolsuz*, 890 F.3d at 137 (internal quotation marks omitted).

Although this "border search" exception to the warrant requirement is broad, it is not boundless. Even when the exception applies, the Supreme Court has explained that certain "highly intrusive searches" may qualify as "'nonroutine'" and so require some level of individualized suspicion. *Flores-Montano*, 541 U.S. at 152 (quoting *Montoya de Hernandez*, 473 U.S. at 541 n.4). Just last year, we applied this principle in the context of an intrusive forensic search of a cell phone at the border. Given the "unparalleled breadth of private information" that such a search could reveal, we held that "a forensic search of a digital phone must be treated as a nonroutine border search, requiring some form of individualized suspicion" even if not a warrant. *Kolsuz*, 890 F.3d at 145–46.[5] If the border exception applies to the May 2015 forensic searches of Aigbekaen's devices, these searches

___

[5] We declined to decide whether reasonable suspicion was sufficient to justify such a search or whether, instead, probable cause was required. *Id.* at 148.

8

(like the forensic searches in *Kolsuz*) were sufficiently intrusive to be "nonroutine" and so required some level of individualized suspicion. *Id.* at 137.

But this raises another question: Does the border exception even apply to the May 2015 forensic searches? Phrased differently, of *what* must the Government have individualized suspicion for the border search exception to apply? Again, precedent offers a clear answer. As the Supreme Court and this court have repeatedly explained, "the scope of a warrant exception should be defined by its justifications." *Id.* at 143 (citing *Riley*, 573 U.S. at 385–91); *accord, e.g.*, *Arizona v. Gant*, 556 U.S. 332, 351 (2009) ("When the[] justifications" underlying an exception to the warrant requirement "are absent, a [warrantless] search . . . will be unreasonable . . . ."). That is to say, a warrant exception will not excuse a warrantless search where applying the exception "would untether the rule from the justifications underlying [it]." *Riley*, 573 U.S. at 386 (internal quotation marks omitted).

The same limitation applies to the border search exception. Indeed, neither the Supreme Court nor this court has ever authorized a warrantless border search unrelated to the sovereign interests underpinning the exception, let alone nonroutine, intrusive searches like those at issue here. Rather, our decision in *Kolsuz* teaches that the Government may not "invoke[] the border exception on behalf of its generalized interest in law enforcement and combatting crime." 890 F.3d at 143. This restriction makes particularly good sense as applied to intrusive, nonroutine forensic searches of modern digital devices, which store vast quantities of uniquely sensitive and intimate personal information, *id.* at 145 (citing *Riley*, 573 U.S. at 393–97), yet cannot contain many forms of contraband, like drugs or

firearms, the detection of which constitutes "the strongest historic rationale for the border-search exception," *United States v. Molina-Isidoro*, 884 F.3d 287, 295 (5th Cir. 2018) (Costa, J., concurring).

Accordingly, as we explained in *Kolsuz*, 890 F.3d at 143, to conduct such an intrusive and nonroutine search under the border search exception (that is, without a warrant), the Government must have individualized suspicion of an offense that bears some nexus to the border search exception's purposes of protecting national security, collecting duties, blocking the entry of unwanted persons, or disrupting efforts to export or import contraband. *See also United States v. Ramsey*, 431 U.S. 606, 620 (1977) ("The border-search exception is grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country."). If a nonroutine search becomes too "attenuated" from these historic rationales, it "no longer [will] fall under" the exception. *Kolsuz*, 890 F.3d at 143. In such circumstances, the search will be unconstitutional unless accompanied by a warrant or justified under a different exception to the warrant requirement.

Applying these principles to the facts at hand, we can only conclude that the warrantless forensic searches of Aigbekaen's devices in May of 2015 lacked the requisite nexus to the recognized historic rationales justifying the border search exception. Of course, when Aigbekaen landed at the airport with his MacBook Pro, iPhone, and iPod in tow, HSI agents had not only reasonable suspicion but probable cause to suspect that he had previously committed grave *domestic* crimes. But these suspicions were entirely unmoored from the Government's sovereign interests in protecting national security,

10

collecting or regulating duties, blocking Aigbekaen's own entry, or excluding contraband. Thus, holding the border search exception applicable here, based simply on the Government's knowledge of domestic crimes, would "untether" that exception from its well-established justifications. *Riley*, 573 U.S. at 386.

Resisting this result, the Government asserts that Aigbekaen's crime "clearly was one that is the proper subject of a border search, because [sex trafficking] is a crime 'commonly involving cross-border movements.'" Supp. Response Br. at 13 (quoting *United States v. Caballero*, 178 F. Supp. 3d 1008, 1017 n.7 (S.D. Cal. 2016)). Of course, the general character of a crime may be relevant to an officer's reasonable suspicion that it involves a transnational component. But inherent in the notion of *individualized* suspicion is some evidentiary basis for what a specific crime *does* involve in the individual case at hand, not just what it "commonly involves" as a general matter. Here, the Government has offered no reasonable basis to suspect that *Aigbekaen's* domestic crimes had any such transnational component.

We also must reject the district court's conclusion that a nonroutine, intrusive search's physical and temporal proximity to an international border "trumps everything" under the Fourth Amendment. To be sure, the Supreme Court has stated that routine border searches "are reasonable simply by virtue of the fact that they occur at the border." *Ramsey*, 431 U.S. at 616. But in the context of "highly intrusive" nonroutine border searches, *Flores-Montano*, 541 U.S. at 152, the Court has explicitly struck a "balance between the interests of the Government and the privacy right of the individual," *Montoya de Hernandez*, 473 U.S. at 540; *see also Riley*, 573 U.S. at 385 (instructing courts to evaluate

11

*any* exception to the warrant requirement by weighing individual privacy interests against "legitimate governmental interests" (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999))). Consistent with this balancing, we clarified in *Kolsuz* that a nonroutine search's *location* is not dispositive of whether the border search exception applies; rather, it is the search's relation to the Government's *sovereign interests* that is paramount. 890 F.3d at 142–43.

Moreover, "the ultimate touchstone of the Fourth Amendment is reasonableness." *Riley*, 573 U.S. at 381 (internal quotation marks omitted). And on the facts of this case, the reasonableness of requiring law enforcement to secure a warrant before conducting an intrusive forensic search of a traveler's digital device, solely to seek evidence of crimes with no transnational component, is readily apparent. By the time Aigbekaen arrived at the airport with his devices, and prior to any searches of those devices, HSI agents had probable cause to believe that Aigbekaen's laptop, at least, contained evidence of domestic sex trafficking. Indeed, in August of 2015, HSI secured warrants to search both the MacBook Pro and the iPhone, relying almost exclusively on evidence that was in agents' possession before Aigbekaen arrived at the airport in May. Given the information in its possession at the time, it is only reasonable to expect the Government to have procured these warrants prior to the May searches.[6]

---

[6] Of course, if HSI agents were unable to timely secure such warrants and reasonably feared that Aigbekaen would destroy the evidence in the meantime, the exigent circumstances exception might apply. *See Riley*, 573 U.S. at 402 (noting that Fourth Amendment "exigencies could include the need to prevent the imminent destruction of evidence in individual cases"). But the Government does not even suggest that exigency played any role here.

In contrast, it would be patently unreasonable to permit highly intrusive forensic Government searches of travelers' digital devices, without warrants, on bases unrelated to the United States's sovereign authority over its borders. To be clear, we do not question the import of the Government's general interest in combatting crime. But we cannot agree that this interest categorically eclipses individuals' privacy interests in the vast troves of data contained on their digital devices when the suspected offenses have little or nothing to do with the border.

As the Supreme Court explained in *Riley*, "[m]odern cell phones, as a category, implicate privacy concerns far beyond those implicated" by physical searches. *Id.* at 393. This is so because cell phones and other modern digital devices feature "an element of pervasiveness" that distinguishes them from physical records; these days, "it is the person who is not carrying a cell phone, with all that it contains, who is the exception." *Id.* at 395. At the same time, these devices have "immense storage capacity," as well as cloud storage capabilities, which they use to collect "in one place many distinct types of information . . . that reveal much more in combination than any isolated record." *Id.* at 393–94, 397. These include unusually sensitive data regarding one's relationships, personal interests and preferences, prior internet searches, location history, and much more. *Id.* at 395–96. To adopt the Government's position, we would need to hold that it could conduct a warrantless forensic search of any traveler's cell phone — uncovering all of this data, including "password-protected" and "deleted material[s]," *Cotterman*, 709 F.3d at 957 — on suspicion that the phone may contain evidence of any prior domestic crime.

13

Because Aigbekaen does not challenge any *routine* border searches, we need not decide whether or how the interests that underpin the border search exception constrain, in practice, the Government's broad and historic authority to conduct suspicionless searches of individuals and their effects at the border. *Ramsey*, 431 U.S. at 616. Similarly, we need not determine what quantum of individualized suspicion, if any, beyond the familiar reasonable-suspicion standard is needed to justify a warrantless forensic search of a device at the border.

We simply apply the teaching of *Kolsuz*: where a search at the border is so intrusive as to require some level of individualized suspicion, the object of that suspicion must bear some nexus to the purposes of the border search exception in order for the exception to apply. Because no such nexus existed here, the warrantless, nonroutine forensic searches violated the Fourth Amendment.

### B.

The Government briefly presses two secondary arguments in an attempt to establish that the May 2015 searches were constitutional. Neither is persuasive.

First, the Government devotes four sentences of briefing to a claim that at the time of the warrantless searches, it "had a concern" that Aigbekaen's devices "might" contain not only evidence of past crimes, but also child pornography. Because of this "concern," the Government maintains, the warrantless forensic searches featured both individualized suspicion and the requisite nexus to a dominant interest underpinning the border search exception: preventing contraband from entering the country.

14

Like the district court, we do not find this claim persuasive. Even assuming that a warrantless forensic search of a digital device at the border could be justified by reasonable suspicion,[7] we can discern no "particularized and objective basis" in the record for agents to reasonably suspect that Aigbekaen possessed child pornography on his devices. *Montoya de Hernandez*, 473 U.S. at 541 (internal quotation marks omitted). The Government's stated "concern" is based on a local police officer's brief testimony, during the suppression hearing, that a hotel manager received a tip from an unnamed employee that the employee had "overheard one of the gentlem[e]n staying in the room [saying], you know, let's hurry up and get this video done." Suppr. Hr'g Tr., ECF No. 193, at 217–19. During cross-examination, the officer was asked if the hotel manager "ever g[a]ve [him] any other indication as to why that [unnamed] employee thought that there was some type of movie making or video making going on," to which he replied, "No." *Id.* at 217. At trial, although the hotel manager recounted in detail the events surrounding L.'s 911 call, he could no longer recall hearing *any* such statement from an employee or relating it to law enforcement. 9/23/16 Trial Tr., ECF No. 259, at 69–70, 76. This isolated, vague, and third-hand allegation does not rise to the level of reasonable suspicion.[8]

---

[7] *See Kolsuz*, 890 F.3d at 148 (declining to determine "whether more than reasonable suspicion is required for a search of this nature").

[8] Notably, although the Government asserted at oral argument before us that it had probable cause (not just reasonable suspicion) to suspect Aigbekaen's devices contained child pornography, not one of HSI's numerous warrant affidavits and CSLI applications included any such allegations. Nor did the HSI agent who testified at the suppression hearing mention any suspicion that Aigbekaen's devices contained child pornography.

15

Second, the Government suggests that the requisite nexus to the purposes of the border search exception was present because Aigbekaen was a "criminal[]" seeking to enter the United States and carried the "instrumentalities" of his domestic crime (that is, his digital devices) into the country with him. Again, we must disagree. If the border search exception is to retain any distinction from the Government's "generalized interest in law enforcement and combatting crime," *Kolsuz*, 890 F.3d at 143, it cannot be invoked to sanction invasive and nonroutine warrantless searches of all suspected domestic "criminals," nor the suspected "instrumentalities" of their domestic crimes. Importantly, the Government does not contend (save for its unavailing child pornography claim) that these "instrumentalities" were contraband.

Because the Government lacked sufficient individualized suspicion of criminal activity with any nexus to the sovereign interests underlying the border search exception, its warrantless forensic searches of Aigbekaen's devices violated the Fourth Amendment.

III.

In the alternative, the Government argues that any constitutional infirmity in the May 2015 searches does not justify reversal for several independent reasons. We turn now to these contentions.

A.

In its brief, the Government maintains that any dispute over these searches is moot because no tainted evidence was admitted at trial. However, the record belies this assertion. At the very least, HSI's affidavit in support of the warrant to search Aigbekaen's Facebook

16

account relied on conversations and screen shots uncovered during the May 2015 searches.[9]  And the Government introduced the Facebook warrant returns at trial.

At oral argument before us, the Government did not dispute these facts.  Instead, it sought to refashion its mootness claim, asserting in its place that the August 2015 warrant-backed searches of Aigbekaen's devices constituted an "independent source" that cured any taint from the prior warrantless searches.  The record evidence, however, does not support application of the independent-source doctrine.  Under that doctrine, evidence "initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality" may be admitted at trial. *Murray v. United States*, 487 U.S. 533, 537 (1988).  But later activities, like the August 2015 searches, do not qualify as independent sources if "the agents' decision to seek the warrant[s] was prompted by what they had seen during the initial [searches]." *Id.* at 542. As the Government conceded at oral argument, the district court did not make *any* factual findings on this point.  Mindful of the Supreme Court's admonition that "it is the function of the District Court rather than the Court of Appeals to determine the facts," *id.* at 543, we cannot assume in the first instance that the August 2015 warrants were not prompted by the May 2015 warrantless searches.

B.

The Government next contends that the good-faith exception to the exclusionary rule bars suppression of any evidence tainted by any constitutional defect in the May 2015

---

[9] The district court later opined that the probable cause underlying this warrant, even with these allegations, was "a little thin."

17

searches. Aigbekaen counters that the lack of a nexus renders the good-faith exception inapplicable. On this point, we must agree with the Government.

The evidentiary fruits of Fourth Amendment violations are generally inadmissible at trial. *See Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963). But the fruits of "a search conducted in reasonable reliance on binding precedent [are] not subject to the exclusionary rule," as that rule is designed "to deter *future* Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236–37, 241 (2011) (emphasis added).

In this case, the HSI agents who searched Aigbekaen's devices in May of 2015 reasonably relied on an "established and uniform body of precedent allowing warrantless border searches of digital devices." *Kolsuz*, 890 F.3d at 148. Although it has long been understood that the scope of a warrant exception should be tailored to the purposes underlying that exception, no court had yet applied that principle to require a warrant "for *any* border search, no matter how nonroutine or invasive." *Id.* at 147; *see also Molina-Isidoro*, 884 F.3d at 294 (Costa, J., concurring) (noting that "no reported federal decision has required a warrant for any border search"). Only in 2018 did this court recognize that "a search initiated at the border could become so attenuated from the rationale for the border search exception that it no longer would fall under that exception" and so require a warrant. *Kolsuz*, 890 F.3d at 143. And only today have we applied that principle to hold unconstitutional such an attenuated, warrantless, nonroutine forensic search at the border.

Tellingly, Aigbekaen offers almost no argument against application of the good-faith exception, save for a question-begging allegation that the Government "attempt[ed] to exploit an exception to the Fourth Amendment warrant requirement." He may well be

18

correct that even prior to *Kolsuz*, "the better practice" would have been for the Government to get a warrant in the first place. But good faith does not mandate best practices. Given the uniform body of precedent that permitted warrantless searches at the border in May of 2015, we cannot help but conclude that the good-faith exception applies here.[10]

IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

---

[10] Aigbekaen also argues, in supplemental briefing, that the multi-week seizures of his digital devices constituted an unreasonable interference with his possessory interests. *See United States v. Pratt*, 915 F.3d 266, 271–73 (4th Cir. 2019). However, Aigbekaen opted neither to press this claim before the district court nor to raise it in his opening brief to this court. In fact, when the district court asked Aigbekaen's counsel whether he intended to develop a factual record regarding the reasonableness of the seizures, his counsel chose not to "request[] any further information" on the issue. We decline to address this forfeited claim. In his *pro se* brief and supplemental briefs, Aigbekaen also raises a host of additional challenges to his conviction and sentence. Although "an appellant who is represented by counsel has no right to file pro se briefs or raise additional substantive issues in an appeal," *United States v. Cohen*, 888 F.3d 667, 682 (4th Cir. 2018), we have examined Aigbekaen's contentions and find no reversible error.

RICHARDSON, Circuit Judge, concurring in the judgment:

For the first time in this Circuit, the Majority holds a border search unlawful by applying a "nexus" requirement tethered to narrowly defined purposes that supposedly underlie the border-search doctrine: national security, blocking the entry of persons, and disrupting the trafficking of contraband. And, although my good colleagues agree that law enforcement reasonably suspected a foreign national of interstate sex trafficking, this reasonable suspicion is not enough for them. Because *interstate* sex trafficking—as "distinguished" from *international* sex trafficking—lacks the Majority's requisite nexus to the perceived purposes of the border-search doctrine, the Majority holds the search of a sex trafficker's cell phone at the border violates the Fourth Amendment.

In my view, the Majority errs in adopting a "nexus" test that is in deep tension with Supreme Court precedent. And even assuming the "nexus" test were proper, I would find it satisfied here.

In the end, the Majority affirms Aigbekaen's conviction based on the good-faith exception to the exclusionary rule. And I agree with that judgment. But I respectfully disagree with the decision to declare this border search unlawful.

**I.**

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. CONST. amend. IV. And as the Supreme Court has explained, "reasonableness" is the "ultimate touchstone of the Fourth Amendment." *Riley v. California*, 573 U.S. 373, 381 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). In determining what is reasonable, courts look to longstanding traditions with an eye towards determining "that

20

degree of privacy against government that existed when the Fourth Amendment was adopted." *United States v. Jones*, 565 U.S. 400, 406 (2012) (quoting *Kyllo v. United States*, 533 U.S. 27, 34 (2001)); *see also Riley*, 573 U.S. at 382 (looking to the historical bases for a search incident to arrest).

One such tradition, the "border-search doctrine," gives government agents at international borders broad discretion to search people and their effects. *United States v. Ramsey*, 431 U.S. 606, 616–17 (1977). The border-search doctrine has "a history as old as the Fourth Amendment itself," *id.* at 619, and rests on the principle "that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity," *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004); *cf. United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 318 (1936) (describing territorial integrity as inherent to sovereignty). Thus, the government's "interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *Flores-Montano*, 541 U.S. at 152. And travelers understand that they subject themselves and their property to some form of search by crossing international boundaries. As a result, "the expectation of privacy is less at the border than it is in the interior." *Id.* at 154.

Supreme Court jurisprudence purports to reflect the border-search doctrine's historical scope. *See Ramsey*, 431 U.S. at 616–19; *see also Boyd v. United States*, 116 U.S. 616, 623–24 (1886). But in the three decades since *Ramsey*, more historical work has been done to understand the Fourth Amendment. *See, e.g.*, WILLIAM J. CUDDIHY, *The Fourth Amendment: Origins and Original Meaning 602–1791* (2009). And in recent years, some work has begun to better understand the border-search doctrine itself—analyzing the

21

backdrop English common-law doctrine, the historical understanding of sovereign prerogatives under international law, the drafting and ratification history of the Fourth Amendment (and relevant state analogues), and statutes enacted around the time the Bill of Rights was ratified (such as the Collection Acts of 1789 and 1790). *See, e.g.*, Note, *The Border Search Muddle*, 132 HARV. L. REV. 2278, 2287–97 (2019).

Based on this more recent historical work, one might ask whether *Ramsey*'s historical analysis would change (or perhaps be confirmed) if we were to revisit the relevant historical sources (including those left aside by *Ramsey*). But this case is neither the time nor the place to do so. We are an inferior court (to say nothing of the lack of briefing focused on this historical inquiry and a somewhat limited academic literature focused on the border-search doctrine). As an inferior court, we take the Supreme Court's precedents as we find them.

And the Supreme Court has repeatedly upheld border agents' broad discretion to conduct searches in sweeping terms, requiring particularized suspicion only for especially intrusive searches. The distinction between "routine" searches and highly intrusive "nonroutine" searches provides the analytical linchpin for determining whether particularized suspicion is required at the border. An agent may undertake routinely intrusive border searches of international travelers—such as patting them down for weapons and rummaging through their luggage—with no articulable suspicion. *Flores-Montano*, 541 U.S. at 152.

Highly intrusive searches at the border that are deemed nonroutine are different. For this limited category, the government must articulate reasonable suspicion. *United States*

22

*v. Montoya de Hernandez*, 473 U.S. 531, 542 (1985).[1]  In *Montoya de Hernandez*, border agents suspected a woman, who had arrived on an international flight, of swallowing balloons containing illegal drugs.  *Id.* at 534−35.  Agents strip searched the woman and detained her for over sixteen hours so that they could inspect the results of a bowel movement.  *Id*. at 535.  Eventually, a federal magistrate authorized a rectal examination, which uncovered a balloon filled with cocaine (the first of eighty-eight ultimately revealed).  *Id.*  Even on these facts, the Supreme Court held that only reasonable suspicion was needed to detain the woman.  *Id.* at 541.

The Supreme Court has suggested that only three highly intrusive situations may qualify as nonroutine:  (1) "highly intrusive searches of the person," (2) searches of property that are "destructive," and (3) searches carried out in a "particularly offensive" manner.  *Flores-Montano*, 541 U.S. at 152–56, 154 n.2; *see also United States v. Cotterman*, 709 F.3d 952, 973 (9th Cir. 2013) (en banc) (Callahan, J., concurring in part, dissenting in part, and concurring in the judgment).

In making this distinction based on the intrusiveness of a search, the Court considers whether the subject of a search is a person or property.  Despite hinting at the possibility that a "destructive" search of property might amount to a nonroutine search, *see Flores-Montano*, 541 U.S. at 152–56, 154 n.2, the Supreme Court has never actually held that any search of *property*—as opposed to *persons*—was "nonroutine."  *See, e.g.*, *United States v.*

---

[1] The potential that particularized suspicion might be required for more intrusive searches had been left open by older precedents.  *See Ramsey*, 431 U.S. at 618 n.13 (not "decid[ing] whether, and under what circumstances, a border search might be deemed 'unreasonable' because of the particularly offensive manner in which it is carried out").

*Touset*, 890 F.3d 1227, 1234 (11th Cir. 2018) ("Property and persons are different."). And the Court has set a high bar for when a property search might ever rise to that level. In *Flores-Montano*, the Court held that customs officers conducted only a "routine" search when they stopped and dissembled a vehicle to remove and inspect its gas tank. 541 U.S. at 155–56. In so holding, the Court instructed that, where border searches of property were involved, only "destructive" or otherwise "particularly offensive" searches of that property would be so intrusive as to require any particularized suspicion. *See id*. at 154 n.2. The Supreme Court also chastised lower courts for being too quick to undermine the simplicity of the border-search doctrine for property with "[c]omplex balancing tests to determine what is a 'routine' search," explaining that such tests "have no place in border searches of vehicles." *Id.* at 152.

Despite that guidance on searches of property at the border, in *United States v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018), we held that a detailed "forensic" search—as opposed to a "manual" search—of an international traveler's electronic devices at the border was "nonroutine" and thus required particularized suspicion. *See id.* at 144 (relying, in part, on *Riley v. California*, 573 U.S. 373 (2014)). That holding may be controversial. *See, e.g.*, *Touset*, 890 F.3d at 1233–36. But whatever one thinks of creating a constitutional distinction between "forensic" and "manual" searches of property, it is the law of our circuit. And so I assume that some degree of suspicion was required for the forensic search of Aigbekaen's electronic devices.

*Kolsuz* also addressed, and rejected, an argument that the search in that case had an inadequate "nexus" to the purposes of the border-search doctrine. We first observed that,

24

"[a]s a general rule, the scope of a warrant exception should be defined by its justifications." *Kolsuz*, 890 F.3d at 143 (citing *Riley*, 573 U.S. at 384–92). We then noted, in general terms, the possibility that a search "*could* become so attenuated from the rationale for the border search exception that it *would* no longer fall under that exception." *Kolsuz*, 890 F.3d at 143 (emphasis added). We held that the search before us in that case did not fail "on any account of a 'nexus' requirement" because the crime being investigated had a "transnational" nature. *Id.* That is, *Kolsuz* held that suspicion of transnational crime was *sufficient* to satisfy any potential "nexus" requirement.

*Kolsuz* did *not* hold that such suspicion was *necessary* for a border search. Nor did *Kolsuz* explain the rationale for the border-search doctrine or otherwise explore the bounds of what constitutes an adequate transnational "nexus." And so the Majority overstates the case when it claims that *Kolsuz* held that "where a search at the border is so intrusive as to require some level of individualized suspicion, the object of that suspicion must bear some nexus to the purposes of the border search exception in order for the exception to apply." Majority Op. at 14. *Kolsuz* merely noted the *possible* existence of a "nexus" requirement and, assuming it existed, concluded that it was satisfied.

## II.

In this case, the Majority goes beyond *Kolsuz* by imposing this transnational "nexus" requirement to hold a border search unlawful for the first time in our circuit.

## A.

Before evaluating the Majority's "nexus" requirement, I briefly note what I understand it to be, and not to be. The Majority opinion does not cast doubt on non-

25

invasive searches (like going through someone's luggage) that happen every day at the border. If such "routine" searches could be challenged as having an inadequate "nexus" to the border, the border-search doctrine would be eviscerated. Thankfully, the Majority does not go there (although it does not rule out the possibility of going there in the future, and it may be challenging to maintain a principled reason for not doing so).[2]

Instead, the Majority's "nexus" requirement comes into play (for now) only for the more intrusive "nonroutine" searches that already require objective, particularized suspicion. It seeks to regulate what *kind* of particularized suspicion is required. In the Majority's view, the grounds for suspicion must dovetail with the ultimate purposes of the

---

[2] The Ninth Circuit has gone there. *United States v. Cano*, 934 F.3d 1002, 1016 (9th Cir. 2019) (holding that "border searches are limited in scope to searches for contraband and do not encompass searches for evidence of past or future border-related crimes"). In that case, the court held that agents could conduct a "manual" search of a phone without any suspicion but that the search exceeded the permissible scope of a border search when agents recorded phone numbers and messages. *Id.* at 1019. The Ninth Circuit reasoned that recording numbers and messages went beyond what was reasonably necessary to search for contraband. *Id.* I find the Ninth Circuit's reasoning on that point hard to accept, both for the reasons I explain below and under the plain-view doctrine: surely, if officers have discovered information during a lawful search, recording that information does not render the search unlawful.

border-search doctrine.[3]  Having reason to believe that the search will uncover contraband—for example, that the person's cell phone contains child pornography— necessarily corresponds to the Majority's purposes of the border-search doctrine.  The Majority is also willing to permit searches for evidence of "transnational" criminal activity.  But when agents seek evidence of domestic crimes, my colleagues decide they need probable cause and a warrant.

**B.**

This "nexus" requirement is inconsistent with the Supreme Court's border-search cases.  Those cases consistently describe the government's powers at the border in sweeping terms:

> Time and again, we have stated that "searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." . . . It is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity.

*Flores-Montano*, 541 U.S. at 152–53 (quoting *Ramsey*, 531 U.S. at 616).  The Supreme Court has limited the border-search doctrine only when the *intrusiveness* of the search makes it unreasonable without particularized suspicion—not based on the *government's*

---

[3] The precise type of "reasonable suspicion" required to establish a nexus has divided courts.  *Compare United States v. Cano*, 934 F.3d at 1020 (narrower:  reasonable suspicion that searched item contains contraband), *with* Majority Op. at 9–11 (broader: reasonable suspicion of prohibited transnational activity).  Of course, in the context of border searches involving child pornography stored in cell phones, the suspicion of contraband (child pornography) and of ongoing prohibited transnational activity (smuggling of child pornography) will overlap.

*interests* or a "nexus" between these interests and the specific search conducted. *See id*. The Court has authorized no further exceptions to the near-absolute description of the doctrine in *Flores-Montano* and *Ramsey*. In fact, it has cautioned lower courts against creating them. *Id.*

The Majority's innovation is to limit the border-search doctrine based not on the *intrusiveness* of the search, but on the nature of the *government's interests* at stake. Not only is there no support for this innovation in the Supreme Court's border-search cases, but this also ignores the Court's admonitions to interpret the doctrine broadly and avoid creating new limitations.

Now there is an argument that the border-search doctrine *should* be limited in this way—or perhaps even more narrowly. Some jurists have taken the view that the border-search doctrine is concerned solely with detection of contraband. *See, e.g.*, *Cano*, 934 F.3d at 1016−19; *United States v. Vergara*, 884 F.3d 1309, 1317 (11th Cir. 2018) (Pryor, J., dissenting). And this narrow reading has some historical support. After all, the Supreme Court has mainly grounded the border-search doctrine in founding-era statutes that authorized warrantless customs inspections. *Ramsey*, 431 U.S. at 616–17 (citing Act of July 31, 1789, ch. 5, § 24, 1 Stat. 29, 43); *see also* Act of Aug. 4, 1790, ch. 35, § 31, 1 Stat. 145, 164–65 (permitting revenue collectors to board and search vessels in coastal waters without suspicion); *id.* at §§ 47–48, 1 Stat. at 169–70 (permitting revenue collectors to open containers on vessels "on suspicion of fraud" without a warrant).

On the other hand, there are reasons to conclude that this "contraband-only" view might be too narrow given the interests of the United States, as sovereign, at its territorial

borders.  As we observed in *Kolsuz*, the government has a broader national-security interest at the border that goes beyond the immediate search for contraband.  890 F.3d at 143.  So we noted that the doctrine should encompass searches for evidence of "ongoing efforts to export contraband illegally, through searches initiated at the border," *id.* at 143−44, not just "direct interception of contraband," *id.* at 143.  Thus construed, the purposes of the border-search doctrine overlap to some degree with general law enforcement.

And the Supreme Court has described the border-search doctrine as being concerned with regulating the movement not only of goods, but also of people.  *Carroll v. United States*, 267 U.S. 132, 154 (1925).  It is "'without doubt' that the power to exclude aliens 'can be effectuated by routine inspections and searches of individuals or conveyances seeking to cross our borders.'"  *Ramsey*, 431 U.S. at 619 (quoting *Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973)); *see also United States v. Oriakhi*, 57 F.3d 1290, 1296 (4th Cir. 1995) ("From the sovereign's power to protect itself is derived its power to exclude harmful influences, including undesirable aliens, from the sovereign's territory.").  And the Supreme Court has articulated the federal government's control over migration— and the nation's borders—as near-plenary.  *See, e.g.*, *Ramsey*, 431 U.S. at 619; *see also U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950).

But no matter how we, as lower-court judges, might wish to shape the doctrine, we are not free to rewrite the Supreme Court's case law based on our own ideas.  And that law is sweeping in its deference to the authority of the government to conduct searches at the border.

Without support in the Court's border-search cases, the Majority bases its "nexus" requirement on the Court's analysis of the search-incident-to-arrest exception in *Riley v. California*, 573 U.S. 373 (2014). Like the *Kolsuz* panel, my colleagues read *Riley* to say that, "[a]s a general rule, the scope of a warrant exception should be defined by its justifications." *Kolsuz*, 890 F.3d at 143. But transplanting *Riley*'s "general rule" into the specific context of border searches to support the "nexus" requirement raises at least two problems.

First, *Riley* said nothing about border searches; it concerned the far different context of searches incident to arrest. We cannot, as lower-court judges, strain to insert the Supreme Court's reasoning from one line of cases into another where it does not fit. Particularly where two areas of case law point in different directions, we must follow the cases that are most on point.[4] And as I have explained, the Court has never held that the border-search doctrine should be "defined by its justifications." *Id.* at 143. To the contrary, it has articulated the doctrine in sweeping terms and told us to apply it accordingly.

---

[4] There are, moreover, important differences between a search incident to arrest and a border search. These differences undermine any reliance on *Riley*'s search-incident-to-arrest analysis to support the "nexus" requirement in the border-search context. For one, the two doctrines have different justifications. The border-search doctrine, unlike the search-incident-to-arrest doctrine, implicates the sovereign's paramount interest in protecting its territorial integrity—suggesting a far broader scope than the narrower rationales justifying the search-incident-to-arrest doctrine. And unlike searches incident to arrest, border searches are based in part on implied consent. Just as airline passengers understand that having their bodies scanned and their bags x-rayed is part of the price of admission to modern airports, so travelers at international crossings have long understood that they are subjecting themselves to search at the border.

And second, *Riley* itself does not support the Majority's approach. *Riley* made clear that we should be looking categorically at the *type of search*—not the *suspicion* motivating the search. *Riley* considered whether the search-incident-to-arrest doctrine, which permits warrantless and suspicionless searches of an arrestee's person and immediate surroundings, should apply to cell-phone searches. In addressing that issue, the Court noted that it had limited the scope of searches falling within this doctrine. For example, the "extensive warrantless search of [an arrestee's] home" cannot be justified as an incident to arrest. 573 U.S. at 383 (citing *Chimel v. California*, 395 U.S. 752, 763, 768 (1969)). This doctrine also does not justify the search of a car once the arrestee has been secured or otherwise brought beyond reach of the vehicle's passenger compartment. *Id.* at 374 (citing *Arizona v. Gant*, 556 U.S. 332 (2009)). The *Riley* Court determined that, for similar reasons, the "particular category of effects" before it (*i.e.*, cell phones) fell outside the search-incident-to-arrest doctrine. *Id.* at 386. In doing so, the Court insisted that the availability of the exception must turn categorically on the type of search. It expressly rejected the prospect of "case-by-case adjudication" resting on "the probability in a particular arrest situation that weapons or evidence would in fact be found." *Id.* at 384 (quoting *United States v. Robinson*, 414 U.S. 218, 235 (1973)).

The Majority takes the very approach that *Riley* rejected, making the scope of the border-search doctrine turn not just on the type of the search as a categorical matter but also on a case-by-case analysis of the probability of finding contraband or evidence of a "transnational" crime in the context of a specific search. If the Majority wants to rely on *Riley*'s search-incident-to-arrest analysis, it should take the bitter with the sweet.

31

Thus, even if *Riley* has relevance for border searches, it teaches us to adopt a simpler test, one unconcerned with the type of misconduct under investigation. Rather than look at the type of governmental interest, the Supreme Court has already instructed us to look at the type of search to determine what, if any, requirements should apply. *Montoya de Hernandez* has given us a two-step analysis based on the type of border search: if the search is routinely intrusive, then no suspicion is required; if the search is highly intrusive and thus nonroutine, then some particularized suspicion is required. *See United States v. Oriakhi*, 57 F.3d 1290, 1297 (4th Cir. 1995) (citing *Montoya de Hernandez*, 473 U.S. 531, 541 (1985)).[5] Instead of looking to the degree of intrusion, the Majority's "nexus" approach focuses on the purpose of the search. This approach fails to faithfully follow either the Supreme Court's border-search cases or *Riley*. I, therefore, respectfully disagree with the Majority's decision to hold the search unlawful on that basis.

## C.

Despite my reservations, the Majority has made its "nexus" requirement the law of this circuit. Having created it, how should it be applied? While apparently leaving the details to another day, the Majority does require that officers have some basis to believe that the border search will uncover (1) contraband or (2) evidence of a "transnational"

---

[5] Perhaps there should be a third category for the most intrusive searches, like body-cavity searches, where more than reasonable suspicion is required. But the Supreme Court has not yet adopted one in its border-search cases (admittedly without ruling one out, *see Montoya de Hernandez*, 473 U.S. at 541 n.4). And in evaluating its intrusiveness, a cell-phone search surely cannot require more than the reasonable suspicion needed to justify the "long, uncomfortable, indeed, humiliating" detention in *Montoya de Hernandez*. *Id.* at 544.

32

crime. Applying that test here, the Majority concludes that the agents' suspicion at the time of the search failed to meet this requirement because, while Aigbekaen was suspected of being an *interstate* sex trafficker, he was not suspected of being an *international* sex trafficker. In my view, the Majority's application of its "nexus" requirement is too narrow.

Consider the evidence that the agents had against Aigbekaen when they conducted the search. On April 12, 2015, a sixteen-year-old girl called 911 from a hotel in Bel Air, Maryland. J.A. 53. She told police that "Raymond" and another man had taken her from New York to Maryland and Virginia, where they had sold her to over one hundred men for sex over the course of a few weeks. She also explained that the men had used Backpage.com to advertise her services. Based on her statement and additional information (a review of Backpage.com postings and hotel records), police identified both men. J.A. 67. They learned that "Raymond" meant Aigbekaen, a Nigerian national, who had paid for the room. J.A. 66. A search of the hotel room revealed used condoms. J.A. 272. Police also spoke to a manager at the hotel, who overheard the two men referring to a "movie" they were making. J.A. 270. Officers learned that Aigbekaen had left the country but would be returning to the United States at JFK International Airport. J.A. 107. They alerted border agents, who stopped Aigbekaen at customs on May 19, 2015, and searched his electronic devices. J.A. 108.

As the Majority agrees, officers had probable cause to believe that Aigbekaen was engaged in interstate sex trafficking of underage girls. Police had the underage victim's statement. They also found evidence that Aigbekaen rented a hotel room used for sex with the girl. And there was evidence that Aigbekaen had used the internet to commit his crimes

33

by posting advertisements on Backpage.com. This meant, of course, that there was probable cause to believe that searching Aigbekaen's electronic devices would turn up relevant evidence. And it would beggar belief to claim that Aigbekaen's crimes were purely historical. Police knew that Aigbekaen had recently sold one underage victim to over one hundred men over a short time. The reasonable inference was that his criminal activity was professional and ongoing.

These facts also supported reasonable suspicion that Aigbekaen's interstate crimes had an international component. Police knew he was a foreign national who trafficked underage girls across state lines for profit and that, while engaged in that business, he traveled abroad. There was at least some reason to suspect that Aigbekaen's foreign travels were not purely personal, but professional as well.

Police also reasonably suspected that Aigbekaen was a foreign national traveling from abroad into the United States with the intent to continue his criminal activity. *Cf. United States v. Oriakhi*, 57 F.3d 1290, 1296 (4th Cir. 1995) ("From the sovereign's power to protect itself is derived its power to exclude harmful influences, including undesirable aliens, from the sovereign's territory.").

And despite the Majority's suggestion, we may view the facts particular to Aigbekaen against the background understanding that many sex crimes have a transnational component. The trafficking of women across international lines is well documented. So is the phenomenon of international "sex tourism." These suspicions about international misconduct may not have risen to the level of probable cause. But they did

rise to the level of reasonable suspicion, which is all we should require to find an adequate "nexus."[6]

There were also reasonable grounds to suspect that Aigbekaen's electronic devices contained child pornography—a type of contraband. Aigbekaen had posted suggestive photos of the underage victim on Backpage.com. While these photos apparently did not constitute child pornography, there was reason to suspect that Aigbekaen might also have more explicit pictures of his victims. (Indeed, given how widely used cell-phone cameras are, one might reasonably guess that very few sex traffickers of underage girls do *not* have child pornography on their phones.) But there was even more direct evidence: the hotel manager had overheard Aigbekaen and his co-conspirator referring to a "movie" they were making. Child pornography is contraband, and reasonable suspicion at the border that someone's electronic devices possess child pornography should be enough for a forensic search under any theory.

The Majority strains to conclude that there was no such reasonable suspicion. But the Majority simply misapplies the law, in effect applying a standard tantamount to probable cause (or perhaps something even more demanding). Reasonable suspicion merely means, under "the totality of the circumstances," there is "a particularized and objective basis for suspecting legal wrongdoing." *United States v. Bernard*, 927 F.3d 799, 805 (4th Cir. 2019) (quoting *United States v. Vaughan*, 700 F.3d 705, 710 (4th Cir. 2012)).

---

[6] The Majority holds that the government lacked reasonable suspicion, leaving open what level of suspicion is generally necessary for this type of search. I would require no more than reasonable suspicion—assuming, of course, that some type of suspicion of a nexus-related activity should be required in the first place.

For example, if police see someone "driving erratically," they have reasonable suspicion that he might be "impaired or fatigued"—despite having no direct evidence. *Id.* In the classic case, officers had "reasonable suspicion" that a group of men were planning to rob a convenience store based on a combination of otherwise "innocent" acts, such as standing around, walking back and forth, talking to each other, and looking at the store repeatedly. *Terry v. Ohio*, 392 U.S. 1, 22–23 (1968). Here, there was a particularized and objective basis for *suspecting* that Aigbekaen—a foreign national who trafficked underage girls for sex across state lines, took photos of them, and was overheard discussing a "movie" with his accomplice—was engaged in illegal conduct during his foreign travels, was entering the country to keep engaging in ongoing and future criminal schemes, and had explicit photos of underage girls on his phone.

In sum, there was reasonable suspicion that Aigbekaen had contraband and that his interstate crimes also had the "transnational" component the Majority would require. That should be more than enough.

\* \* \*

The scope of the border-search doctrine raises difficult questions. But in my view, the Majority's "nexus" requirement does not faithfully follow the Supreme Court's case law. In any event, this requirement is satisfied here, making it a particularly troubling case to reach beyond good faith to find the search unlawful.