# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-1801
_____

United States of America

*Plaintiff - Appellee*

v.

Haitao Xiang

*Defendant - Appellant*

------------------------------

Electronic Frontier Foundation; American Civil Liberties Union;
Knight First Amendment Institute at Columbia University;
Reporters Committee for Freedom of the Press

*Amici on Behalf of Appellant*
_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis
_____

Submitted: January 12, 2023
Filed: May 5, 2023
_____

Before SMITH, Chief Judge, WOLLMAN and LOKEN, Circuit Judges.
_____

LOKEN, Circuit Judge.

"Congress, since the beginning of our Government, has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country." United States v. Flores-Montano, 541 U.S. 149, 153 (2004) (quotation omitted). "[T]he rationale behind this [border search] exception [to the Fourth Amendment's warrant requirement] applies with equal force to persons or objects leaving the country." United States v. Udofot, 711 F.2d 831, 839 (8th Cir. 1983).

Haitao Xiang, a citizen of the People's Republic of China and long-time resident of the United States, conditionally pleaded guilty to conspiracy to commit economic espionage in violation of 18 U.S.C. §§ 1831(a)(5).[1] He appeals the conviction and sentence. The principal issue is whether the district court[2] erred in denying Xiang's motion to suppress evidence obtained by a warrantless seizure and forensic search of Xiang's digital devices as he was leaving Chicago's O'Hare International Airport, with Shanghai, China his final destination. Applying the Fourth Amendment border search exception, the district court concluded that U.S. Customs and Border Protection ("CBP") officers had reasonable suspicion to conduct non-routine forensic searches of Xiang's electronic devices and acted reasonably in doing so. We agree. We also conclude that Xiang waived his appeal of the $150,000 fine the district court imposed as part of his sentence. Accordingly, we affirm.

---

[1]As relevant, the statute is violated by "[w]hoever, intending or knowing that the offense will benefit any foreign government, foreign instrumentality, or foreign agent, knowingly" conspires to "steal[], or without authorization . . . carr[y] away . . . a trade secret."

[2]The Honorable Henry E. Autrey, United States District Judge for the Eastern District of Missouri, adopting the Report and Recommendation of the Honorable John M. Bodenhausen, United States Magistrate Judge for the Eastern District of Missouri.

-2-

## I. Background

From September 2008 to June 2017, Xiang was employed as an Advanced Imaging Scientist with Monsanto Co., headquartered in St. Louis, Missouri. On May 25, 2017, Xiang tendered his resignation. On June 5 and June 8, Anne Luther, a Senior Investigator for Monsanto's Global Security Team, met with FBI Special Agent Jaret Depke, who was then assigned to the Foreign Counterintelligence Squad and was an officer with the Joint Terrorism Task Force at the FBI office in St. Louis. Luther advised Agent Depke that Xiang was a senior research application engineer who had been on Monsanto Security's radar in 2008 for misrepresenting himself as a University of Illinois student while attempting to acquire information about hyperspectral imaging technology; that Xiang had submitted his resignation; and that an exit interview was scheduled for June 9. Depke also talked to others at Monsanto. He learned that Xiang had "conducted some suspicious Google searches" that suggested a plan to send company documents to a third party; "sent packets of information" to a Chinese competitor called NERCITA; and "sent confidential Monsanto information from his work email to his personal email." Xiang was also known to be an associate of a former Monsanto employee named Jiunnren Chen, who the FBI investigated after he took a job with China National Seed, a Monsanto competitor; downloaded documents containing trade secrets; and sent emails containing confidential information from his work account to a personal account. Xiang was telling people that he planned to work for a potential Monsanto competitor called Ag-Sensus, a remote-sensing agriculture start-up company with Lei Tian, his former PhD advisor at the University of Illinois. Agent Depke considered this a national security investigation involving potential theft of trade secrets.

On June 8, following his second meeting with Luther, Depke contacted CBP Officer Art Beck, a fellow member of the Joint Terrorism Task Force and the Counterintelligence Squad, to discuss what Depke learned from his Monsanto contacts. Beck ran a check on Xiang, learning he was married with one child residing

in St. Louis. A travel notification told Beck that Xiang planned to travel to Shanghai on a one-way ticket without his family on June 10th, the day after his exit interview. Beck considered this information and the fact that Xiang was leaving Monsanto to work for a start-up company to be suspicious "red flags." He decided to subject Xiang to a CBP inspection at O'Hare Airport on June 10 and advised Agent Depke of CBP's inspection, interview, and border search capabilities.[3] Beck put in a CBP "Record Lookout" alerting O'Hare officials that a secondary inspection of electronic devices might be needed, based on national security concerns such as theft of trade secrets. See Directive 3340-049, § 5.3, Detention and Review in Continuation of Border Search of Information. Because the port of entry decides whether to inspect, Beck advised CBP Officer Swiatek in Chicago of the reasons for Beck's suspicions ("the articulables," as he described them at the suppression hearing).

After Xiang's June 9 exit interview, Monsanto personnel told Agent Depke that Xiang was "extremely nervous" and "sweating" when asked about the suspicious Google searches. Luther gave Depke a copy of Xiang's signed termination in which he agreed he would have no devices, records, data, notes, etc. in his possession that belonged to Monsanto and would not share confidential information with any third parties. Monsanto personnel described Xiang as extremely nervous while reviewing

---

[3]See CBP Directive 3340-049, Border Searches of Electronic Devices Containing Information, § 5.1, Border Searches (Aug. 20, 2009). This Directive was in effect when Xiang's devices were searched in 2017. CBP issued Directive 3340-049A in January 2018, which superseded Directive 3340-049. Section 5.1.4 of the later Directive expressly provides that "an Officer may perform an advanced search of an electronic device," which includes forensic searches, if "there is reasonable suspicion of activity in violation of the laws enforced or administered by CBP, or in which there is a national security concern." Directive 3340-049 did not address this issue. The government has argued to many of our sister circuits that reasonable suspicion is not required, with mixed results. Our decision in this case is consistent with the current Directive. We need not decide whether reasonable suspicion was required under the prior Directive, on which there is circuit conflict.

those provisions and assessed him as "blatantly deceptive." Monsanto provided Depke a copy of Xiang's "suspicious Google searches" that included searches for "company information to the third party," "I don't want it to be an evidence," and "as evidence to accuse me."

Xiang rented a car in St. Louis on June 9 and drove to Chicago. At O'Hare on June 10, CBP Agents conducted an interview and initial border search of Xiang's checked and carry-on baggage prior to his flight. Based on the interview and prior information, CBP seized a cell phone, laptop computer, SD card, and a SIM card from Xian's baggage for a secondary inspection. Xiang boarded his flight and left. Officer Swiatek took custody of the seized devices and advised Officer Beck of the seizure. Beck alerted FBI Agent Depke. Because Monsanto's trade secret personnel are in St. Louis and Depke had an established relationship with Monsanto, Depke had "a better chance of quickly and expediently identifying anything that would be of interest or potentially identified as that company's trade secrets." Therefore, exercising Chicago's extended CBP border search authority, Beck had the devices sent to St. Louis for "subject matter expertise review" by an assisting federal agency. See Directive 3340-049, § 5.3.2.3.

Depke received the devices on June 13. The FBI Chief Division Counsel confirmed that Depke could, within the authority of CBP, review the electronic devices. The devices were opened and examined by a Computer Analysis Response Team ("CART") on June 14, 2017. CART created forensic images, and Depke began a preliminary search on June 20. He identified six documents believed to be Monsanto trade secrets or intellectual property, which Monsanto confirmed that day or on June 21. At that point, CBP transferred its seizing authority to the FBI. See Directive 3340-049, § 5.4.2.3. On July 27, the FBI applied for and obtained a warrant to search the electronic devices.

## II. Motion to Suppress Issues

After the district court denied his motion to suppress, Xiang entered a conditional plea of guilty, reserving the right to appeal that ruling. See Fed. R. Crim. P. 11(a)(2). When reviewing the denial of a motion to suppress, we review findings of fact for clear error and conclusions of law *de novo*. See United States v. Taylor, 519 F.3d 832, 833 (8th Cir. 2008) (standard of review).

**A.** Xiang's primary argument on appeal is that the government needed a warrant to search his electronic devices "because the forensic search did not fall within the Fourth Amendment border search exception," and therefore the general rule applies that, "[i]n the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." See Riley v. California, 573 U.S. 373, 382 (2014). As the opening paragraph of this opinion hopefully makes clear, it blinks at reality to assert that CBP's seizure and search of the electronic devices Xiang was about to carry abroad was not a "border search" of the type conducted by the Executive throughout our nation's history. Xiang's argument is that "electronic devices are different," as the Supreme Court recognized in Riley, and therefore the government must get a warrant to even open them up at a port of entry, when all other property is subject to "routine searches and seizures at the border, without probable cause or a warrant." Flores-Montano, 541 U.S. at 153. Riley involved a different Fourth Amendment exception, searches incident to arrest. No Circuit has held that the government must obtain a warrant to conduct a routine border search of electronic devices. The First Circuit carefully explained why Xiang's broad argument "rests on a misapprehension of the applicability" of Riley. Alasaad v. Mayorkas, 988 F.3d 8, 16-19 (1st Cir. 2021); see United States v. Wanjiku, 919 F.3d 472, 484-85 (7th Cir. 2019). We agree.

Xiang further argues that the search of his electronic devices was outside the scope of the border search exception because it was "not tethered to any border search

justifications." The Ninth Circuit has stated that "[a] border search must be conducted to enforce importation laws, and not for general law enforcement purposes." United States v. Cano, 934 F.3d 1002, 1013 (9th Cir. 2019) (quotation omitted); see United States v. Aigbekaen, 943 F.3d 713, 721 (4th Cir. 2019). Conversely, the Second Circuit has stated, more sensibly in our view, that CBP officers "have the authority to search and review a traveler's documents and other items at the border when they reasonably suspect that the traveler is engaged in criminal activity, even if the crime falls outside the primary scope of their official duties." United States v. Levy, 803 F.3d 120, 124 (2d Cir. 2015). But regardless of whether there is any limitation on using border searches "to investigate general criminal wrongdoing," the assertion that the search of Xiang's electronic devices was "not tethered to any border search justifications" is absurd. Congress passed the Economic Espionage Act of 1996 because:

> There can be no question that the development of proprietary economic information is an integral part of America's economic well-being. Moreover, the nation's economic interests are a part of its national security interests. Thus, threats to the nation's economic interest are threats to the nation's vital security interests.

H.R. Rep. No. 104-788, at 4 (1996), as reprinted in 1996 U.S.C.C.A.N. 4021, 4023; see United States v. Hsu, 155 F.3d 189, 194-95 (3d Cir. 1998).

Xiang's additional assertion that the Fourth Amendment does not permit border searches for mere evidence of criminal activity was rejected by the Supreme Court over fifty years ago, see Warden v. Hayden, 387 U.S. 294, 300-02 (1967), and more recently by circuit courts in this context, see Alasaad, 988 F.3d at 20.

The real issue in this case is not whether the border search exception applies, but whether the extended border search conducted by CBP officers, with technical assistance from the FBI and Monsanto, is consistent with the Fourth Amendment's

overriding purpose to protect "against *unreasonable* searches and seizures." In United States v. Montoya de Hernandez, the Supreme Court held that when a routine border search becomes non-routine -- in that case, the 16-hour detention of an arriving traveler -- "customs agents, considering all the facts surrounding the traveler and her trip, [must] reasonably suspect that the traveler is smuggling contraband in her alimentary canal." 473 U.S. 531, 541 (1985).

Many of our sister circuits have distinguished between "routine" and "non-routine" border searches of electronic devices. Most have concluded that a seizure at the port of entry, followed by a forensic or "advanced" search, particularly if time consuming and conducted away from the port of entry, becomes a non-routine border searches requiring some level of reasonable, individualized suspicion, but not probable cause or a warrant.[4] As discussed, see note 3 supra, Directive 3340-049A adopted this fact-intensive approach. We think it is an appropriate standard, particularly given the heightened personal privacy interest in electronic devices recognized in Riley. But like the Seventh Circuit in Wanjiku, we need not decide today whether reasonable suspicion is required for an advanced or forensic border search of electronic devices because we agree with the district court that CBP officers had reasonable suspicion for the forensic search they conducted.

**B.** Xiang argues that, if the border search exception does apply, the CBP officers lacked the requisite reasonable suspicion. "Reasonable suspicion exists when an officer is aware of particularized, objective facts which, taken together with

---

[4]Compare Alasaad, 988 F.3d at 13 (1st Cir. 2021); United States v. Kolsuz, 890 F.3d 133, 144 (4th Cir. 2018); and United States v. Cotterman, 709 F.3d 952, 967-68 (9th Cir. 2013) (en banc), with United States v. Touset, 890 F.3d 1227, 1233 (11th Cir. 2018) (reasonable suspicion not required for personal property including electronic devices), and Wanjiku, 919 F.3d at 489 (7th Cir. 2019) (declining to reach the issue).

rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." United States v. Tamayo-Baez, 820 F.3d 308, 312 (8th Cir. 2016) (quotation omitted). We must review "the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002) (quotation omitted).

When CBP Officers seized Xiang's devices at O'Hare Airport, officers were aware of the following information: Xiang resigned from his position as a Monsanto imaging scientist the day before; he was leaving the country without his family on a one-way trip to China and then planned to work for an agricultural start-up company; Monsanto personnel were concerned about Xiang stealing trade secrets -- he had conducted suspicious Google searches and was visibly nervous when asked about the searches during his exit interview; he had transferred unknown company information from his company email account to a personal email account and appeared nervous and deceptive when signing a termination contract that barred him from sharing Monsanto trade secrets and confidential information with others; previously, Xiang associated with a former colleague who downloaded and transmitted confidential Monsanto documents to a personal email account before leaving to work for a Chinese competitor; Xiang had sent packets of unknown information to a Chinese competitor, NERCITA; and Monsanto's security team believed that Xiang, as a new Monsanto employee in 2008, misrepresented himself as a University of Illinois student in an attempt to acquire information about an imaging company named SpecTIR.

Xiang argues that this gave CBP officers no reasonable suspicion he was engaged in even a violation of company policy, much less economic espionage or criminal theft of trade secrets. They did not know what "packets of information" he sent to NERCITA. Sending emails from his work account to a personal account does not point to criminal activity. There was no evidence he was involved in coworker

Chen's wrongdoing. The Google searches were stale evidence -- over a year prior to the seizure of his electronic devices. Resigning and traveling to visit his family in China are not indicative of any criminal wrongdoing. The agents' "background" on the "trend" of Chinese trade are "profiling" that provides little to no value, nothing more than "unparticularized suspicion or hunch."

We agree with the district court that this argument is contrary to well-established Fourth Amendment principles. "The totality-of-the-circumstances test precludes this sort of divide-and-conquer analysis." United States v. Quinn, 812 F.3d 694, 698 (8th Cir. 2016) (quotation omitted). Even though "each of these [suspicious] factors alone is susceptible of innocent explanation, and some factors are more probative than others[,] . . . together . . . they sufficed to form a particularized and objective basis." Arvizu, 534 U.S. at 277. The officers and agents had background information, much of it corroborated, that provided a basis for assessing Xiang's actions in May and June 2017. Their experience and training in international economic espionage and theft of trade secrets gave them reasonable suspicion for an extended border search that included a forensic search of electronic devices.

**C.** Finally, Xiang argues the search of his devices was constitutionally unreasonable because it was akin to an "invasive rummage," violated CBP policies, was unreasonable in duration, and CBP calling on the FBI for subject matter expertise was pretextual. These contentions require little discussion. The "rummaging" cases on which Xiang relies -- Kremen v. United States, 353 U.S. 346, 347-48 (1957) and Go-Bart Importing Co. v. United States, 282 U.S. 344, 358 (1931) -- bear no resemblance to the focused search of electronic devices in this case. If law enforcement officers have reasonable suspicion to search a container, such as a backpack, briefcase, or electronic device, they have not conducted an unconstitutional "rummaging" if they find the contraband at issue at the bottom of the backpack, underneath lots of innocent items they did not seize or further search. As presented, the argument is frivolous.

Xiang's other arguments are likewise without merit. We agree with the district court that "exclusion based on a failure to follow regulatory procedure is only warranted if (1) the procedure is mandated by the Constitution or (2) the defendants reasonably relied on the procedure in governing his conduct." United States v. Xiang, No. 4:19CR980, 2021 WL 4810556 at *3 (E.D. Mo. Oct. 15, 2021), citing United States v. Caceres, 440 U.S. 741, 749-53 (1979). There was no such showing here. Xiang's argument that the CBP search was "a pre-textual search . . . to gather evidence for SA Depke's investigation" disregards Officer Beck's credited testimony that his actions were taken in exercise of CBP border search authority; the express authorization for interagency cooperation and sharing of information in Directive 3340-049, § 5.4; and the common sense reality that there is nothing "pretextual" about members of an interagency Counterintelligence Squad working together to ferret out economic espionage and international trade secret theft that violates 18 U.S.C. § 1831(a).

Finally, as we have explained, the record demonstrates why, after Xiang's devices were retained for extended inspection, it took time to send the devices to St. Louis, where FBI Agent Depke could most efficiently conduct the search, and Monsanto's trade secrets security professionals could then confirm that the devices contained trade secrets and proprietary information. During the interim, neither Xiang nor anyone acting on his behalf asked that the devices be returned, or even inquired about them. Thus, the extended seizure "did not meaningfully interfere with his possessory interests," United States v. Clutter, 674 F.3d 980, 984 (8th Cir.), cert. denied, 133 S. Ct. 272 (2012), and CBP was obligated to "appropriately safeguard information retained, copied, or seized under this Directive and during transmission to another federal agency." Directive 3340-049, § 5.4.1.5. The search was not constitutionally unreasonable.

### III. Imposition of a Fine

In his plea agreement, Xiang "waive[d] all rights to appeal all sentencing issues" except for those explicitly preserved -- the district court's determination of the applicable guidelines and Xiang's criminal history and the substantive reasonableness of any sentence above the guidelines sentencing or fine range. Xiang's PSR stated that he has "the ability to pay a fine" and calculated his advisory guidelines range as 10-16 months imprisonment, one to three years supervised release, and a fine of $55,000.00 to $5,000,000.00. At sentencing, Xiang renewed his objection to the PSR's restitution recommendation. The district court imposed an above-range sentence of twenty-nine months' imprisonment, imposed a $150,000 fine, and held "in abeyance its judgment on restitution." Xiang did not object to the fine.

Xiang appeals imposition of the $150,000 fine, arguing "the district court made no factual findings." He does not challenge the substantive reasonableness of the fine, only the imposition of a fine without factual findings. This is an alleged procedural error he waived in his plea agreement. Moreover, as he did not object at sentencing, the challenge is not only waived but forfeited and may only be reviewed for plain error. See United States v. Wohlman, 651 F.3d 878, 886 (8th Cir. 2011). The district court did not err, much less plainly err in imposing a $150,000 fine.

The judgment of the district court is affirmed.

_____